# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **TAZEWELL SHEPARD,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO.** |
| | ) | **5:20-cv-00771-MHH** |
| **GREGORY CARDWELL,** | ) | |
| | ) | |
| Defendant. | ) | |
| **JUDITH THOMPSON,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO.** |
| | ) | **5:20-cv-00776-MHH** |
| **GREGORY CARDWELL,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiffs in these consolidated cases are bankruptcy trustees for the estates of VGC, Inc. d/b/a Visions and GBC, Inc. d/b/a Showcase. Pursuant to the Alabama Fraudulent Transfer Act, the trustees seek damages from Gregory Cardwell, the former owner of Visions and Showcase. Visions and Showcase were nightclubs where exotic dancers performed. Several dancers who worked at the clubs are creditors of the bankruptcy estates because they have pending Fair Labor Standards Act claims against Visions and Showcase for alleged unpaid wages. The

1

bankruptcy trustees ask the Court to find as a matter of law that Mr. Cardwell fraudulently transferred funds from VGC and GBC to his personal accounts to avoid FLSA judgments against the clubs in favor of the dancers. In this opinion, the Court examines the trustees' motion.

## I.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that a genuine dispute as to a material fact precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

"[A] litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving,

but that alone does not permit us to disregard them at the summary judgment stage."). Even if a district court doubts the veracity of certain evidence, the court cannot make credibility determinations; that is the work of jurors. *Feliciano*, 707 F.3d at 1252 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences from the evidence in the light most favorable to the non-moving party. *Sconiers v. Lockhart*, 946 F.3d 1256, 1260 (11th Cir. 2020). Therefore, in this opinion, the Court views the summary judgment evidence in the light most favorable to Mr. Cardwell.

## II.

The elements of the trustees' claim under the Alabama Fraudulent Transfers Act dictate the facts material to the trustees' claim. To succeed on a claim under the Alabama Fraudulent Transfers Act, a plaintiff must establish three elements: "(1) a creditor to be defrauded, (2) a debtor intending to defraud, and (3) a conveyance of property out of which the creditor could have realized his claim or some portion thereof." *Dial v. Morgan*, 525 So. 2d 1362, 1364 (Ala. 1988) (citing *Reese v. Smoker*, 475 So. 2d 506, 508 (Ala. 1985)). A creditor is any "person who has a claim," including an unresolved, pending lawsuit. Ala. Code §§ 8-9a-1(3)-(4) (1975); *see also Richardson v. Chambless*, 266 So. 3d 684, 689 (Ala. 2018).

A fraudulent transfer claim may involve actual fraud, which is the "mental operation of intending to defeat or delay the rights of the creditor," or constructive fraud, which rests on "facts and circumstances which the courts have said constitute legal fraud" regardless of actual intent. *Gordon v. Gorman*, 436 So. 2d 851, 854 (Ala. 1983). Alabama's Fraudulent Transfers Act identifies 11 factors that a factfinder may consider in determining whether a debtor intended to defraud. Among the factors are whether: "The transfer was to an insider"; "The transfer was disclosed or concealed"; "Before the transfer was made the debtor had been sued or threatened with suit"; "The debtor removed or concealed assets"; and "The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred." Ala. Code § 8-9a-4 (1975).

## III.

The trustees assert that Mr. Cardwell fraudulently transferred money from Visions and Showcase to himself to prevent dancers who performed at the clubs from accessing those funds to satisfy potential judgments against the clubs. (Doc. 3-1). The funds at issue are a $25 fee the dancers contend the clubs required each dancer to pay for each shift worked and a $5 deduction the dancers contend the clubs took from each $25 a dancer received from a customer for a private dance.

In affidavits, the dancers state that each paid a $25 "tip-out" for each shift she worked. (Doc. 16-3, p. 8, ¶ 4; Doc. 16-4, pp. 7-8, ¶ 4; Doc. 16-5, p. 8, ¶ 4).

4

According to the dancers, the clubs never had fewer than eight dancers working the night shift on weeknights or fewer than 20 dancers working the night shift on weekends. (Doc. 16-3, p. 8, ¶ 3; Doc. 16-4, p. 7, ¶ 3; Doc. 16-5, pp. 7-8, ¶ 3). The dancers also state that they charged a $25 fee for each private dance, that they retained $20 of that fee, and that they paid $5 to the club. (Doc. 16-3, p. 4, ¶ 11; Doc. 16-4, p. 4, ¶ 11; Doc. 16-5, p. 4, ¶ 11). The dancers attest that each performed at least six private dances each shift, and on weekends, most dancers performed a minimum of 15 private dances per shift. (Doc. 16-3, p. 8, ¶ 6; Doc. 16-4, p. 8, ¶ 6; Doc. 16-5, p. 8, ¶ 7).

Combining tip-outs and the clubs' cut of private dance fees, the trustees estimate that each club collected at least $55 ($25 tip-out plus $5 for each of at least six private dances) from each dancer on weeknights and $100 ($25 tip-out plus $5 for each of at least 15 private dances) from each dancer on weekend nights. Using these figures, the trustees calculate that each club must have collected at least $288,000 per year from night shift dancers alone, assuming a 50-week year with each club open four weeknights and two weekend nights.

| Weeknights | | | |
|---|---|---|---|
| Dancers | Rate | Weeknights/Year | Total |
| 8 | $55 | 200 | $88,000 |
| **Weekends** | | | |
| Dancers | Rate | Weekend Nights/Year | Total |
| 20 | $100 | 100 | $200,000 |
| | | **Grand Total** | **$288,000** |

According to the trustees, Mr. Cardwell did not record these revenues in the clubs' financial records and instead pocketed the funds. (Doc. 3-1, p. 5, ¶ 17).

Mr. Cardwell testified that the clubs charged dancers $10 per shift, not $25; that ordinarily three or four dancers worked weeknights and from three to 14 dancers worked weekends; and that he combined money collected from dancers with entrance fees paid by customers and treated the total as "door money" in his accounting. (Doc. 19, pp. 17, 21-23, tpp. 54-55, 71, 73-74, 80-81).[1]  The clubs'

---

[1] The trustees contend that the following exchange from Mr. Cardwell's deposition establishes conclusively that the clubs charged dancers $25 per shift:

> Q. Whether the door fee was twenty-five dollars or ten dollars, there's no paperwork on that, is there? No document is going to tell us that?
>
> A. Right.
>
> . . .
>
> Q. All right. So if they [the dancers] came and testified that was the working conditions and that's [sic] was the rules and we always paid twenty-five dollars, you couldn't dispute that, could you?

6

financial records from 2014 to 2017 indicate that monthly door income typically totaled $3,500-$6,000 and never exceeded $6,214 per month at either club. (Doc. 19, pp. 42-120; Doc. 20, pp. 5-26, 70-121; Doc. 21, pp. 2-34). Mr. Cardwell testified that from the door money, he paid the clubs' bills, and he paid himself after he paid the bills. He deposited the cash collected in excess of the clubs' bills in his personal bank account. (Doc. 19, pp. 19-20, tpp. 65-68).

## IV.

The trustees acknowledge that the question of whether a debtor conveyed funds with fraudulent intent ordinarily is for a jury. (Doc. 16, p. 17). "'This is in part because actual fraudulent intent requires a subjective evaluation of the debtor's motive.'" *International Management Grp., Inc. v. Bryant Bank*, 274 So. 3d 1003, 1016 (Ala. Civ. App. 2018) (quoting *In re Earle*, 307 B.R. 276, 293 n. 9 (S.D. Ala. 2002)).

---

A. No.

(Doc. 19, p. 26, tp. 91:8-92:10). Evidence that the clubs did not record the amounts they assessed dancers per shift may assist the dancers in establishing their FLSA claims. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-88 (1946). But for purposes of the trustees' motion for summary judgment on their fraudulent transfer claims, the Court must accept Mr. Cardwell's testimony that the clubs charged dancers $10 per shift. *See* (Doc. 19, pp. 21-22, tpp. 73-74) ("Now, as far as I know [the tip-out fee] was ten dollars."); (Doc. 19, p. 22, tp. 75) ("I never heard of me getting no twenty-five."); (Doc. 19, p. 22, tp. 76); "I know I didn't get twenty-five dollars"); (Doc. 19, p. 22, tp. 77) ("I have no knowledge of nobody paying twenty-five dollars to work there"); (Doc. 19, p. 23, tpp. 78-79) ("I ain't never heard nobody, no girl paying twenty-five dollars paying [sic] to work nowhere"); (Doc. 19, p. 25, tp. 86) ("[A]ssume for me the dancer paid twenty-five dollars to work there. I know you dispute that, but let's just assume it for this question."); *see also Feliciano*, 707 F.3d at 1252-53.

> Moreover, "it is clear that actual intent to hinder, delay, or defraud is a heavily fact-dependent question." *Vista Bella*, 511 B.R. at 195. "Actual fraud ... most often ... is revealed through circumstantial evidence," and "intention is a mental emotion, of which the external signs are the acts and declarations of the parties, taken in connection with the concomitant circumstances." *Clear Creek, Inc. v. Royal American Corp. (In re International Resorts, Inc.)*, 46 B.R. 405, 413 (N.D. Ala. 2984). As the *Vista Bella* court explained, "[f]raudulent transfer issues ... generally come down to the credibility of witnesses." *Vista Bella*, 511 B.R. at 193. Thus, determinations regarding actual intent to "hinder, delay, or defraud" are not well suited for summary judgment. *See SE Prop. Holdings, LLC v. Braswell*, 255 F.Supp.3d 1187, 1202 (S.D. Ala. 2017) (declining to enter a summary for a defendant on a claim under § 8-9A-4(a) based on, in part, "the highly fact-specific nature of the actual intent query").

*Bryant Bank*, 274 So. 3d at 1016.

The trustees contend that summary judgment is appropriate in this case because even conservative estimates of the clubs' revenue from the payments they required dancers to make exceeded what the clubs' financial records disclose, indicating that Mr. Cardwell must have pocketed the extra, unrecorded cash that the clubs collected from the dancers. The trustees point out that Mr. Cardwell acknowledged that he paid himself what remained after satisfying the clubs' bills. (Doc. 16, p. 11).

But the evidence, viewed in the light most favorable to Mr. Cardwell, indicates that from the early days of GBC's operation in 2014 and VGC's operation in 2015, Mr. Cardwell paid himself in cash from the "door money." There is no evidence that he adopted this practice only after four dancers filed an FLSA action

against the clubs in September of 2016. (Doc. 16-1). And from the outset, the clubs' financial records did not contain an income line for fees collected from dancers. The clubs' "Monthly Total Sales" records were unsophisticated in 2014, and they remained so through 2017. The record viewed in the light most favorable to Mr. Cardwell does not suggest that he changed the clubs' accounting practices after dancers sued the clubs to recover unpaid wages. Thus, while the clubs failed to keep transparent records of funds generated by dancers, the evidence, viewed in the light most favorable to Mr. Cardwell, does not suggest that the clubs' accounting practices or his practice of paying himself cash from door receipts was designed to frustrate dancers' efforts to recover in their FLSA actions. And the disputed evidence regarding the fees that the dancers generated weighs in Mr. Cardwell's favor at the summary judgment stage of this fraudulent transfer action.[2]

For these reasons, the trustees' fraudulent transfer claim against Mr. Cardwell is a garden-variety claim subject to the general rule that fraudulent intent is a question of fact that is not well-suited to resolution on a motion for summary judgment.[3]

---

[2] As the trustees argue, Mr. Cardwell may have sought bankruptcy protection for the clubs to avoid a judgment in favor of the clubs' dancers in their FLSA action, (Doc. 16, pp. 18-19), but at the summary judgment stage, the Court may not infer from the bankruptcy proceedings that Mr. Cardwell intended to defraud the clubs' dancers when he paid himself in cash and maintained unsophisticated financial records for the clubs.

[3] The trustees' reliance on *Holsombeck v. USAmeriBank* is misplaced. 264 So. 3d 91 (Ala. Civ. App. 2018). In that case, the Alabama Court of Civil Appeals affirmed a Fraudulent Transfers Act

## V.

For the reasons discussed above, the Court denies the trustees' motion for partial summary judgment.

**DONE** and **ORDERED** this September 20, 2022.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

judgment for the creditor bank following a trial, not entry of summary judgment. As the Alabama Court of Civil Appeals explained, the bank "filed a motion for a partial summary judgment regarding all claims except its claim of fraudulent transfer. The circuit court entered a partial summary judgment in favor of the bank and conducted a trial on the remaining fraudulent-transfer claim." *Holsombeck*, 264 So. 3d at 93.